*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

GEORGE GERALD RIDER,

      Defendant-Appellant.

UNPUBLISHED
August 18, 2022

No. 350096
Macomb Circuit Court
LC No. 2017-003420-FC

---

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

MARCIE TASHONNIE GRIFFIN,

      Defendant-Appellant.

No. 350168
Macomb Circuit Court
LC No. 2017-003421-FC

---

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

ERIC MALCOM GIBSON,

      Defendant-Appellant.

No. 350516
Macomb Circuit Court
LC No. 2017-003419-FC

---

Before: SAWYER, P.J., and SHAPIRO and REDFORD, JJ.

PER CURIAM.

-1-

In these consolidated appeals, codefendants George Rider (Docket No. 350096), Marcie Griffin (Docket No. 350168), and Eric Gibson (Docket No. 350516) appeal as of right their convictions stemming from the shooting death of Julii Johnson in Warren, Michigan. Each defendant was convicted of first-degree premeditated murder, MCL 750.316(10(a), and Gibson was also convicted of possession of a firearm during the commission of a felony, MCL 750.227b(1). The trial court sentenced each defendant to life imprisonment without parole for the murder conviction, and sentenced Gibson to an additional two-year term of imprisonment for his felony-firearm conviction. We affirm Griffin's and Gibson's convictions, but for defendant Rider we affirm in part and remand for further proceedings.

## I. BASIC FACTS

This case arises from the shooting death Julii Johnson on the morning of January 13, 2017, outside the home of her boyfriend, James Lattner. The home is located in Warren, near 13 Mile Road and Mound Road. Johnson left Lattner's home at approximately 7:30 a.m. and walked to her car, which was parked in the street. Once at the car, Johnson was shot seven times, with one bullet entering her forehead. Johnson was later pronounced dead at the hospital.

The police conducted a search of the area, including the inside of Lattner's home. The police found more than $500,000 in cash and more than a dozen cell phones inside Lattner's home. The police also discovered a hidden compartment inside Lattner's pickup truck, which housed a nine-millimeter Ruger pistol. Sgt. Charles Rushton opined that it appeared that Lattner was involved with drug trafficking. However, because of other evidence discovered, the police ultimately concluded that Lattner's apparent drug business was not related to Johnson's death.[1] The police found five spent casings near Johnson's body. During searches of the surrounding area, with the assistance of K-9 units, the police discovered a pair of gloves in a nearby marshy area.

On January 16, 2017, police officers returned to the scene and canvassed the area for any potential surveillance videos that may be of assistance. The officers located a video at a nearby L.A. Fitness that showed an SUV parked on the south side of the building on the morning of January 13. A person got out of the passenger door, walked around the east side (front) of the building, and headed north toward a walking path that led to the subdivision where the shooting occurred. The video showed the person later returning to the vehicle.

After watching the video, officers attempted to retrace the subject's steps from the L.A. Fitness parking spot to the shooting scene. Sgt. James Wolfe testified that the walk took about seven minutes. He also knew where the gloves had been found and searched more of the large marshy area. Sgt. Wolfe subsequently discovered a nine-millimeter Smith & Wesson handgun, about 100 yards away from where the gloves were found.

---

[1] The serial numbers on the Ruger firearm found in Lattner's pickup had been filed off, and Lattner faced charges in federal court pertaining to the firearm. Because of these pending federal charges, Lattner successfully invoked his right to remain silent and did not testify at defendants' trial.

## A. CELL-PHONE INVESTIGATION

A primary part of the police investigation centered around cell-phone usage. On January 13, 2017, three cell phones were seized from Lattner. While Officer Brandon Roy reviewed data from Lattner's phones, he discovered text messages between Lattner and Griffin. There were a large number of communications between the two (more than 1,000 from May 2016 until December 2016 alone), with the vast majority being sent or initiated by Griffin. Lattner and Griffin had two children together, but were not currently a couple. Griffin's text messages to Lattner were very hostile and derogatory toward Johnson, Lattner's current girlfriend. A sampling of some of Griffin's texts include:

> "so you bring our son to sleep in that bed where that hoe sleep[?] Really[?]"

> "Ugly funny looking ass b*tch."

> "go be with that rat ass keeping up sh*t b*tch of yours."

> "You walked out on your family (chasing a rat hoe with zero potential)."

> "This b*tch was running around telling mother f**kers she was your girlfriend doing the same sh*t right now."

> "you let that b*tch disrespect me that's the ultimate no-no"

> "I'm f**king dying the whole world know you a bold b*tch but wait til I get these mother f**kers know you put that flat no shape slut before your kids."

> "I'm f**king embarrassed you f**king with a flat no shape dumb as f**k nothing ass b*tch."

> "yeah you stupid b*tch… you have the nerve to keep bring that dummy around your nama die b*tch."

> "I hope Man Man catch you and that b*tch on Mogul and blast y'all dumb asses."

> "you put this b*tch in a car before your own flesh and blood."

> "don't keep eating that p*ssy freak. I heard some bad sh*t behind that one and you put them lips on my kid."

Other text messages by Griffin showed that she had access to personal information related to Johnson. In one message to Lattner, Griffin stated, "now you have a dumber b*tch that ride around getting speeding tickets, license always suspended, no proof of insurance, must I go on?" Griffin then texted Johnson's driver's license number. Also, during one of Griffin's texting rants, Lattner asked, "Who you talking about now??" and Griffin responded, "You should always know who I'm talking about. You f**k your family off for." A few days later, during another rant, after Lattner asked Griffin what she was talking about, Griffin responded, "#JLJ," which are Johnson's initials.

On January 4, 2017, Griffin confronted Lattner at his car-wash business. Lattner's nephew, Londell Harvey, was present at the time and video-recorded the encounter. Harvey said he did so because Griffin was so mad and angry that he thought she was going to hurt Lattner and feared for his safety. During this encounter, Griffin at one point told Lattner, "Y'all remember this conversation. B*tch, I'm coming. I promise you on my daddy, I'm getting you. I'm gonna, I'm gonna hit you in your stomach. F**k this b*tch." Later that evening, Harvey sent the video to Lattner, which Officer Roy found during his examination of Lattner's phone.

Based on the text-message thread, Officer Roy obtained a search warrant for Griffin's phone, but the phone contained no data from before approximately noon on January 13, 2017, the day Johnson was killed. However, records from the cell-phone company showed that Griffin's phone received text messages from a phone with a 4616 number at 8:44 p.m. the night before Johnson was killed, and at 9:17 a.m. on the day of the shooting. Believing that whomever Griffin was texting may be connected to the shooting, Officer Roy sought a search warrant pertaining to the 4616 number. The warrant was issued on January 27, 2017, and sought to recover data, including "pinging" location information, from the cell-phone provider, Metro PCS.

However, the phone was silent and did not start "pinging" until Saturday, February 4, 2017. The phone was pinging from 29801 Greater Mack in St. Clair Shores, which is where Gloria Ray lived. Sgt. Rushton conducted surveillance and saw Rider leave the residence in a Ford Explorer. Sgt. Rushton followed and was notified that the pinging data was following the movement of the Explorer. Rider drove to a car wash,[2] and when he tried to exit, the police stopped his vehicle. Rider was removed from the vehicle and the police seized two cell phones from his person. Sgt. Rushton saw that there was a third phone sitting in the Explorer, and when Rider did not consent to that phone being seized, Sgt. Rushton had the car impounded. A search warrant subsequently was obtained, which authorized the seizure of that third phone and the search of the contents of all three phones. Text messages recovered from that search suggested that Rider and Griffin met the night before the shooting.[3]

On the morning of the shooting, a series of outgoing calls were made from Rider's phone to Gibson's phone at 5:24 a.m., 5:33 a.m., 5:44 a.m., and 5:48 a.m. At 9:16 a.m., approximately two hours after Johnson was shot, Rider texted Griffin, "Good morning sunshine, today is a beautiful day. Friday the 13th." Griffin responded, "Lol…" Rider then stated, "I hope you understand!" and Griffin replied, "Evrythg bout I understand."

On February 7, 2017, the police seized a cell phone from Gibson, but because it was an old-style flip-phone, Officer Roy was unable to get a "data dump" of the device.

A key part of the prosecution's case was evidence showing the locations of the various phones. As Officer Roy explained, when a cell phone communicates, it attempts to connect with the strongest signal from a cell tower, which usually is the closest one. Each tower typically has

---

[2] This was a different car wash than the one where Griffin confronted Lattner.

[3] The text messages discussed the two meeting for dinner, Griffin wanting to "meet ASAP," and Rider "pulling up" to their meeting place.

three sections, with each covering a third of a circle, or a 120-degree arc. Cell-phone providers keep track of which section of a tower was used for each communication. Although the data is useful, it cannot pinpoint precisely where inside a particular coverage area a phone is located.

The data from the cell-phone company showed that at 5:19 p.m. on January 12, 2017, the day before the shooting, Rider's phone was utilizing sections of towers encompassing the shooting scene and the nearby L.A. Fitness. Later that evening, Rider's phone and Griffin's phone were utilizing similar towers and sections in downtown Detroit. And later still, Rider and Gibson utilized similar towers around 10:30 p.m., suggesting that they met in person. At 7:42 a.m. the next morning, shortly after the shooting, Rider's phone was utilizing a cell tower near Coolidge and I-696. There was evidence that the shooting occurred just before 7:30 a.m. and that it would take approximately 12 minutes to drive from the L.A. Fitness to that area. Thus, given the time it would take for the shooter to return to the vehicle parked at the L.A. Fitness,[4] Rider's position makes it possible that he was at the L.A. Fitness at the time of the shooting.

## B. LAB TESTING

Tool-mark testing of the casings that were found near Johnson's body were confirmed to have been fired from the recovered Smith & Wesson firearm. Further, at least one of the bullets recovered from Johnson was confirmed to have been fired from that same Smith & Wesson.[5]

DNA testing was performed on several items. Of note, it was a near certainty[6] that Gibson's DNA was found in and on the gloves that were recovered near the scene. Testing on the Smith & Wesson firearm similarly showed that it was extremely likely that Gibson's DNA was present on that firearm.[7]

---

[4] Sgt. Wolfe testified that it would take approximately seven minutes to walk from the shooting scene to the parking spot at the L.A. Fitness. Thus, it obviously would take less time if a person was running.

[5] The other bullet samples either were too small to test or simply yielded results that were "consistent" with them being fired from the Smith & Wesson.

[6] The testing showed that it was "43 quadrillion," i.e., 43,000,000,000,000,000, times more likely that DNA from the inside of the gloves originated from Gibson and two unrelated, unknown people rather than from three unrelated, unknown individuals. And it was "4.5 octillion," i.e., 4,500,000,000,000,000,000,000,000,000, times more likely that the DNA from the gloves' pull straps came from Gibson and two unrelated, unknown people as opposed to three unrelated, unknown contributors.

[7] The retest of the Smith & Wesson firearm showed that it was 2.5 billion times more likely that Gibson's DNA plus that of three other unrelated, unknown contributors was on the grip of the pistol, as opposed to four unrelated, unknown contributors. And it was 55 billion times more likely that Gibson's DNA plus those of three unrelated, unknown people was present on the trigger of the Smith & Wesson firearm as opposed to four unrelated, unknown people.

## C. VEHICLE EVIDENCE

The security video from the L.A. Fitness showed that a dark colored SUV parked at some point before the shooting and left shortly thereafter. Coincidentally, Gibson was pulled over for a traffic violation on January 12, 2017, the day before the shooting, and he was driving a Nissan Pathfinder with license plate HQE210 from Colorado. At the time, this same vehicle was rented by Gloria Ray, who lived with Rider. Ray knew Gibson because he was a friend of her son. It was established that Rider knew Gibson as well because a video from a Home Depot showed two individuals together, and Ray identified the individuals as Rider and Gibson. Sgt. Rushton stated that a Nissan Pathfinder was the vehicle that was seen parking in the L.A. Fitness parking lot on the morning of the shooting.

All three defendants were tried before one jury, which jury convicted the defendants as charged. These appeals followed.

## II. DOCKET NO. 350096 (DEFENDANT RIDER)

## A. SEIZURE OF 4616 PHONE

Rider argues that his 4616 phone was illegally seized because there was no warrant authorizing that seizure and no exception to the warrant requirement applies. However, because defense counsel asserted in the trial court that a warrant did authorize the seizure,[8] Rider is precluded from taking a contrary position on appeal. See *People v Carter*, 462 Mich 206, 214-215; 612 NW2d 144 (2000); *Czymbor's Timber, Inc v City of Saginaw*, 269 Mich App 551, 556; 711 NW2d 442 (2006). Thus, his claim that the trial court erred by failing to suppress any evidence on this basis is waived. However, his claim of ineffective assistance warrants review. See *Carter*, 462 Mich at 215-218.

Defendants have the guaranteed right to the effective assistance of counsel. *Strickland v Washington*, 466 US 668, 686; 104 S Ct 2052; 80 L Ed 2d 674 (1984); *People v Aceval*, 282 Mich App 379, 386; 764 NW2d 285 (2009). Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise. *People v LeBlanc*, 465 Mich 575, 578; 640 NW2d 246 (2002). Generally, to establish a claim of ineffective assistance, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and (2) there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different. *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012).

At issue is whether defense counsel was ineffective by agreeing that the warrant authorized the seizure of Rider's cell phone from his person during the stop at the car wash.

"The Fourth Amendment of the United States Constitution and its counterpart in the Michigan Constitution guarantee the right of persons to be secure against unreasonable searches

---

[8] Rider's position was that although the warrant purported to authorize the seizure of his phones, it was void for lack of probable cause, which is not his argument on appeal.

and seizures." *People v Kazmierczak*, 461 Mich 411, 417; 605 NW2d 667 (2000). The purpose of the protections "is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Carpenter v United States*, 585 US ___; 138 S Ct 2206, 2213; 201 L Ed 2d 507 (2018) (quotation marks and citation omitted). "Whether a search or seizure is lawful depends on whether it is reasonable. Therefore, a search for purposes of the Fourth Amendment occurs when the government intrudes on an individual's reasonable, or justifiable, expectation of privacy." *People v Mahdi*, 317 Mich App 446, 457-458; 894 NW2d 732 (2016) (quotation marks and citations omitted). "A warrantless search and seizure is per se unreasonable unless shown to fall within one of the various exceptions to the warrant requirement." *People v Roberts*, 292 Mich App 492, 503; 808 NW2d 290 (2011) (quotation marks and citation omitted).

In this case, the police seized Rider's 4616 cell phone from him after stopping him as he was exiting a car wash. The police ordered him out of the vehicle and took the phone from his person. On appeal, Rider points out that, contrary to everyone's understanding at the trial court, the warrant at issue did not authorize the physical seizure of any phones. We agree.

The search warrant was issued on January 27, 2017, and stated, in pertinent part:

**The person, place, or thing to be searched is described as and is located at:**

1. Metro PCS, Specifically records associated with Metro PCS phone number [***-***]-4616.

**The PROPERTY to be searched for and seized, if found, is specifically described as:**

1. The real time location of the Metro PCS mobile device with assigned phone number [***-***]-4616 using any means for the period beginning 01/27/2017 at the time of receipt of this order until 02/26/2017 at 0000 HRS EST.

2. Subscriber information, to include name, address and phone number.

3. Other numbers associated with aforesaid account.

4. Text message detail to include cell site location and sector for the period beginning 01/01/2016 and ending 01/27/2017.

5. Call log detail to include cell site location, sector and distance from tower measurements for the period beginning 01/01/2016 and ending 01/27/2017.

6. Cellular site records shall include GPS location of the cellular site, as well as sector/azimuth information.

7. Type of phone affiliated with the account(s).

8. A list of definitions pertinent to the records supplied.

9. Said records shall be supplied in digital format.

"Search warrants and the underlying affidavits are to be read in a common-sense and realistic manner." *People v Landt*, 439 Mich 870 (1991), citing *Illinois v Gates*, 462 US 213; 103 S Ct 2317; 76 L Ed 2d 527 (1983). Reading the warrant in a common-sense and realistic manner reveals that it only authorized the procurement of *data and records from Metro PCS*; it did not address the physical search or seizure of any phone. For some reason, the parties in the trial court took the view that the warrant not only authorized the recovery of the phone's location data (i.e., "pinging" data), but also authorized the phone's physical seizure. But the warrant cannot be read to include any physical seizure. Recently, in *People v DeRousse*, ___ Mich App ___, ___; ___ NW2d ___ (2022) (Docket No. 358358); slip op at 7, this Court held that a search warrant that described with great particularity one location, a residence, did not authorize a search of the residence's nearby barns.[9] Therefore, the warrant in this case—authorizing a search of data from Metro PCS—cannot be read as authorizing the seizure of the 4616 phone from Rider when officers stopped him at the car wash. Rider's defense counsels' performed below an objective standard of reasonableness when they read the warrant as stating otherwise.[10]

The prosecution on appeal tacitly agrees that this January 27 warrant did not authorize the seizure of Rider's phone because it now relies on a different warrant to justify the seizure. The prosecution relies on a warrant that was executed on February 4, 2017 (the same day as the seizure), which states, in relevant part:

1. The person, place or thing to be searched is described as and is located at:

---

[9] We observe that *DeRousse* presented a much closer call than the situation presented in this case because, as the dissent in *DeRousse* explained, the warrant was somewhat ambiguous because it seemed to permit a search of the barns. *DeRousse* (BOONSTRA, J., dissenting); slip op at 3. Although the warrant listed the place to be searched as a single-story residence, the warrant also referred to farm animals being seized, which would be expected to be found in a barn, not a residence. *Id*. Regardless, there is no such ambiguity in the instant warrant.

[10] At the motion hearing, when the trial court asked if there was a search warrant to "ping" the phone, the parties responded:

> *[The Prosecutor]*: Correct, your Honor.
>
> *THE COURT*: And --
>
> *[Rider's Attorney]*: And take that.
>
> *[The Prosecutor]*: Correct.

Additionally, predecessor defense counsel also averred that "[t]he search warrant gave the investigators permission to locate the phone *and seize the phone*." (Emphasis added.)

-8-

A white 2016 Ford Explorer PA plate "HZK2533" VIN 1fm5kd8xggb87646 which can currently be located at 29900 Civic Center city of Warren, county of Macomb, state of Michigan. The vehicle registers to Hertz Vehicle LLC 8201 Bartram Philadelphia PA 19153.

2. The property to be searched for and seized, if found, is specifically described as:

Any and all evidence, including, but not limited to any trace evidence, weapons, ammunition, clothing, notes and paper work that would link to the homicide of Julii Johnson. Also to be seized if found is records not limited to bills, papers an [sic] or documents which may provide the identity of suspects, such as but not limited to utility bills, mail correspondence, personal identification and photograph.

This warrant cannot support the seizure of the 4616 phone from Rider's possession because it clearly indicates that Rider's vehicle had already been taken to 29900 Civic Center Drive in Warren, which is the address of the Warren Police Department. Sgt. Rushton explained that Rider's vehicle was impounded from the car wash and towed back to the police station. Thus, the interaction with Rider at the car wash had already taken place, including the seizure of the phone from his person, before this warrant was issued.

Thus, we must conclude that the seizure of the 4616 phone from Rider was accomplished without a warrant, and defense counsel did not provide effective assistance by taking the position that the warrant authorized the seizure. To be entitled to relief, Rider must also establish a reasonable probability that but for counsel's error, the result of his proceeding would have been different. *Trakhtenberg*, 493 Mich at 51. This error could not have affected the outcome of Rider's trial unless it allowed the admission of evidence that otherwise would have been inadmissible under the exclusionary rule. Thus, it is necessary to consider whether the seizure ultimately was unconstitutional, thereby potentially implicating the exclusionary rule.

Because there was no warrant for the seizure, it was per se unreasonable unless it fell within a recognized exception to the warrant requirement. See *Roberts*, 292 Mich App at 503. In the trial court and on appeal, because the prosecution has maintained that there was an authorizing warrant, it did not provide an exception that might apply to the warrant requirement. Notably, it is the government that bears the burden of showing that a search was justified by a recognized exception. *People v Chowdhury*, 285 Mich App 509, 521; 775 NW2d 845 (2009). Although the prosecution had the burden to show that an exception applied, it is understandable why one was not provided in the trial court, given that defense counsel never contended that the seizure was conducted without a warrant. We decline to address this issue on the existing record because the prosecution has not had a full opportunity or reason to address the issue in the trial court. Therefore, while retaining jurisdiction, we remand this case to the trial court for an evidentiary hearing to determine whether defense counsel's deficient performance had a reasonable probability of affecting the outcome of Rider's trial. At that hearing, the trial court shall also decide (1) whether the warrantless seizure was nonetheless reasonable, i.e., did a recognized exception to the warrant requirement apply, (2) if no exception applies, whether the exclusionary rule bars the use of any evidence discovered during a search of the 4616 phone, and (3) to the extent that evidence was

admitted at trial that should not have been admitted, whether there is a reasonable probability that the outcome of Rider's trial would have been different had the evidence not been admitted.

## B. PROSECUTORIAL MISCONDUCT

Rider argues that he is entitled to a new trial because the prosecutor impermissibly argued facts not in evidence. We disagree.

We review preserved[11] claims of prosecutorial misconduct de novo to determine if the defendant was denied a fair and impartial trial. *People v Thomas*, 260 Mich App 450, 453; 678 NW2d 631 (2004). Claims of prosecutorial misconduct are reviewed on a case-by-case basis, examining the remarks in context. *People v Watson*, 245 Mich App 572, 586; 629 NW2d 411 (2001). "The propriety of a prosecutor's remarks depends on all the facts of the case." *People v Rodriguez*, 251 Mich App 10, 30; 650 NW2d 96 (2002). "Prosecutorial comments must be read as a whole and evaluated in light of defense arguments and the relationship they bear to the evidence admitted at trial." *Id*.

Rider primarily takes issue with the prosecutor's arguing that Rider was at the crime scene the day before the shooting. During rebuttal, the prosecutor stated, "If Ms. Griffin did not request Mr. Rider to do anything, why is he at the murder scene the night before? Why are the phones attributable to him there on January 12th, 2017?" Griffin's attorney objected, averring that "there was no evidence on this record that Mr. Rider was at the crime scene." Following a bench conference, the trial court sustained the objection. Immediately after, the prosecutor displayed one of the exhibits that showed which cell tower was being utilized by Rider's phone at 5:00 p.m. on January 12, and stated, "And, then, where does [Rider] go from there, from the area where the murder happened?" Griffin's attorney again objected, and the court again said it was sustaining the objection. The prosecutor then said that he would "clean it up," and stated, "The phone attributable to George Rider is interacting with cell towers the night before the murder, in the area of the murder."

We see no error, and consequently no resulting prejudice, in the prosecutor's comments. Attorneys are not limited to simply recounting the evidence; they are empowered to argue reasonable inferences from that evidence. *Watson*, 245 Mich App at 588; see also *People v Dobek*, 274 Mich App 58, 66; 732 NW2d 546 (2007). The prosecutor relied on evidence showing that Rider's phone utilized a tower near the crime scene, and was specifically utilizing the face of the tower that was pointed in the general direction of the scene, to reasonably infer that Rider was indeed near the scene. Moreover, after the sustained objections, the prosecutor, consistent with the trial court's rulings, gave the "sanitized" version of where Rider was by stating that Rider's phone was interacting with cell towers that were "in the area of the murder," which is factually correct. Consequently, to the extent that the prosecutor's initial comments were improper, any prejudicial effect was allayed with the court sustaining the objections and the prosecutor modifying

---

[11] In response to an objection by codefendant Griffin to the prosecutor's comments at issue, many people began talking over each other, with Rider's attorney interjecting as well. Although the transcript does not clearly reflect that Rider's attorney lodged an objection, we nonetheless will give counsel the benefit of the doubt and treat the issue as preserved.

his argument to clarify that he was relying on the evidence that showed that Rider's phone interacted with a cell tower near the crime scene. Further, the trial court specifically instructed the jury that it was to only consider the evidence presented at trial and that the attorneys' arguments were not evidence. Juries are presumed to follow their instructions. *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998). The court's instruction was sufficient to protect Rider's right to a fair trial.

## C. ADMISSIBILITY OF "GOT HER DOG" TEXT MESSAGE

Rider argues that he is entitled to a new trial because his due-process rights were violated when the trial court erroneously admitted a particular text message into evidence. Although the text message was not admissible, Rider is not entitled to any relief.

Although Rider asserts that his counsel objected to the at-issue text message and provides record citations, the cited pages do not indicate that Rider's counsel objected to this particular text message. Moreover, there were no objections on the basis that any due-process rights were being violated. Accordingly, this issue is unpreserved. "Unpreserved claims of evidentiary error are reviewed for plain error affecting the defendant's substantial rights." *People v Benton*, 294 Mich App 191, 202; 817 NW2d 599 (2011). Likewise, unpreserved constitutional issues also are reviewed for plain error affecting substantial rights. *People v Shafier*, 483 Mich 205, 211; 768 NW2d 305 (2009).

At trial, the prosecutor offered into evidence a text message sent by Barbara Bellamy to a person called "Tone." The message was sent on January 13, 2017, around noon, shortly after Bellamy learned about Johnson's death. Bellamy's text message stated, "I think Marcie got her dog." During closing argument, the prosecutor stated:

> So, the first person [Bellamy] gets ahold of [after learning about the shooting] is Tone, who one of the few things she acknowledged during her testimony, remember she actually acknowledged Tone, but she didn't know the name, his real name? At 12:50 [sic—12:10], again given the hour change that Roy talked about: I think Marcie got her dog.

> Now, you guys decide for yourself what that means. I think Marcie got her dog, like a puppy. Or, I think Marcie got her, and then the slang term, dog.

Although the prosecutor ostensibly left the text's interpretation up to the jury, it is clear that the prosecutor was suggesting that the text showed that Bellamy thought that Griffin was responsible for Johnson's death. In other words, the text was being offered to show that Bellamy thought that Griffin was responsible for Johnson being killed. It is a "settled and long-established rule that a witness cannot express an opinion concerning the guilt or innocence of a defendant." *People v Parks*, 57 Mich App 738, 750; 226 NW2d 710 (1975); see also *People v Fomby*, 300 Mich App 46, 53; 831 NW2d 887 (2013). With no other purpose for introducing the text message than to show Bellamy's opinion of Griffin's culpability, the text was plainly inadmissible.

In order to be entitled to appellate relief, however, Rider must also show that the plain error affected his substantial rights, meaning that it affected the outcome of the proceeding. *People v Jones*, 468 Mich 345, 356; 662 NW2d 376 (2003). We conclude that Rider has not met this

requirement. Bellamy's purported opinion was limited to Griffin being responsible for Johnson's death. It did not implicate Rider at all. Even assuming Griffin was responsible and Gibson was the shooter, Rider's defense all along was that there was nothing to show that he aided or abetted the crime, i.e., that he was the person who drove Gibson to the scene. Therefore, Bellamy's purported opinion related to Griffin had no effect on the jury's determination with regard to Rider. Accordingly, Rider is not entitled to appellate relief on the basis of this unpreserved issue.

### D. ADMISSIBILITY OF EVIDENCE—TEXTS BETWEEN GRIFFIN AND LATTNER

Rider also argues that the trial court abused its discretion by admitting evidence of text messages between Griffin and Lattner. We disagree. We review preserved evidentiary issues for an abuse of discretion. *People v Mahone*, 294 Mich App 208, 212; 816 NW2d 436 (2011). A trial court abuses its discretion when it selects an outcome falling outside the range of reasonable and principled outcomes. *People v Dixon-Bey*, 321 Mich App 490, 496; 909 NW2d 458 (2017).

At the outset, Rider does not identify the particular messages be believes were erroneously admitted. Instead, he makes the blanket argument that all of Griffin's text messages to Lattner were inadmissible. As noted earlier, Griffin's text messages to Lattner were extremely hostile and derogatory toward Johnson.

Rider argues that the messages are hearsay and do not satisfy the hearsay exception in MRE 804(b)(3), which pertains to statements against the declarant's penal interest. But no hearsay exception is needed because the statements do not qualify as hearsay. Hearsay is defined as an out-of-court statement offered to prove the truth of the matter asserted. See MRE 801(c). The text messages were not offered to prove the truth of the matters asserted in the messages. For instance, "you let that b*tch disrespect me" was not offered to show that Lattner actually let or allowed Johnson to disrespect Griffin. Likewise, comments such as Johnson being "ugly," a "rat ass," or a "dumb b*tch" were not offered to prove that Johnson was any of those demeaning things. Instead, all of these derogatory text messages were offered to demonstrate Griffin's hostile state of mind or feelings toward Johnson. Consequently, they are not hearsay and Rider's argument fails.

### III. DOCKET NO. 350168 (DEFENDANT GRIFFIN)

### A. SEIZURE OF GRIFFIN'S PHONES

Griffin argues that her phones were illegally seized and all evidence gleaned from them should have been suppressed. We disagree.

"To preserve an issue, a party must raise it before the trial court." *People v Swenor*, 336 Mich App 550, 562; 971 NW2d 33 (2021). Further, a challenge on one ground in the trial court is insufficient to preserve a challenge on another ground on appeal. *Id.* Griffin has not identified where she preserved this issue in the trial court, and we have not located any instance where she challenged the seizure of the phones. Although Griffin objected to the admissibility of text messages, it was a general objection to "the majority" of text message on grounds of relevance, foundation, authentication, hearsay, and unfair prejudice. There was no argument that her phones were illegally seized. Consequently, this issue is unpreserved.

Unpreserved constitutional issues are reviewed for plain error affecting substantial rights. *Shafier*, 483 Mich at 211. Under the plain-error rule, a defendant has the burden to prove that there was an error, it was plain, i.e., clear or obvious, and the error affected the outcome of the proceedings. *People v Anderson*, ___ Mich App ___, ___; ___ NW2d ___ (2022) (Docket No. 354860); slip op at 4, lv pending.

The United States and Michigan Constitutions protect against unreasonable searches and seizures. US Const, Am IV; Const 1963, art 1, § 11. "Whether a search or seizure is lawful depends on whether it is reasonable. Therefore, a search for purposes of the Fourth Amendment occurs when the government intrudes on an individual's reasonable, or justifiable, expectation of privacy." *Mahdi*, 317 Mich App at 457-458 (quotation marks and citations omitted). "A warrantless search and seizure is per se unreasonable unless shown to fall within one of the various exceptions to the warrant requirement." *Roberts*, 292 Mich App at 503 (quotation marks and citation omitted).

Griffin's argument is limited to the actual seizure of her phones from her person by Sgt. Wolfe. Sgt. Wolfe testified at trial that he took two cell phones from Griffin when he met her at her place of employment on January 19, 2017. However, it is not clear that these phones were seized without a warrant. Although Sgt. Wolfe stated that a warrant was obtained to collect DNA samples from Griffin, and did not similarly mention a warrant in reference to the phones, that does not necessarily mean that there was no warrant to seize the phones. Indeed, Officer Roy testified that after reviewing the text exchanges between Griffin and Lattner from Lattner's phone on the day of the offense, he "authored a search warrant" for Griffin's phone. It is not evident that Sgt. Wolfe obtained Griffin's phones before Officer Roy's search warrant was issued, or that Sgt. Wolfe did not rely on that warrant. Therefore, on the basis of the record before us, Griffin has failed to establish the requisite plain error.

Moreover, even assuming that the seizure of the phones was illegal, Griffin has failed to show how her trial was affected. The prosecutor avers that regardless of the legality of the seizure of Griffin's phones, no evidence was derived from those phones that prejudiced Griffin. The prosecution notes that all the inflammatory text messages that Griffin made regarding Johnson were recovered from Lattner's phone, not Griffin's. With respect to the messages between Griffin and Lattner, this is correct. However, although Griffin does not specify precisely what evidence was illegally obtained (besides the phones themselves), she asserts that the evidence "gleaned" from her phone led to Rider's phones. Thus, Griffin appears to argue that the resulting search of her phone revealed Rider's phone numbers, which then led to the seizure of his phones. This position is not supported by the evidence. Officer Roy testified that he learned of the connection between Griffin's phone and Rider's phone through the data recovered *from the cell-phone company*, not from Griffin's phone itself. Therefore, assuming there was any Fourth Amendment violation associated with the physical seizure of Griffin's phones, Griffin has not successfully identified any evidence that would be subject to suppression. Because she has not demonstrated any outcome-determinative prejudice, she is not entitled to appellate relief with respect to this issue.

## B. RIGHT TO BE PRESENT

Griffin argues that she was denied the constitutional right to be present at certain pretrial hearings. We disagree. Because Griffin never raised this issue in the trial court, it is unpreserved. Therefore, we review this issue for plain error affecting substantial rights. *Shafier*, 483 Mich at 211.

"The Due Process Clause and the Confrontation Clause of the Sixth Amendment, as applied to the States via the Fourteenth Amendment, both guarantee to a criminal defendant . . . the right to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings." *Tennessee v Lane*, 541 US 509, 523; 124 S Ct 1978; 158 L Ed 2d 820 (2004) (quotation marks and citation omitted). This right includes a "right to personal presence at all critical stages of the trial . . . ." *Rushen v Spain*, 464 US 114, 117; 104 S Ct 453; 78 L Ed 2d 267 (1983). "Critical stages of the proceedings are stages where counsel's absence may harm the defendant's right to a fair trial." *People v Green*, 260 Mich App 392, 399; 677 NW2d 363 (2004), overruled on other grounds *People v Anstey*, 476 Mich 436; 719 NW2d 579 (2006); see also *People v Donaldson*, 103 Mich App 42, 48; 302 NW2d 592 (1981) ("Critical stage is understood to mean prosecutorial activity which has some effect on the determination of guilt or innocence which could properly be avoided, or mitigated, by the presence of counsel."). Griffin complains that neither she nor her counsel were present at pretrial hearings on September 24, 2018, November 21, 2018, and February 25, 2019, but she has failed to show how these hearings constituted "critical stages."

None of these hearings involved a proceeding in which Griffin's (or counsel's) absence may have harmed Griffin's right to a fair trial. The November 21, 2018 hearing involved the trial court's consideration of Rider's motion to suppress evidence from his phones as the result of an illegal seizure. "The right to be free from unreasonable searches and seizures is personal, and the right cannot be invoked by a third party." *Mahdi*, 317 Mich App at 458-459. Because the issue at the November 21, 2018 hearing only involved Rider's motion that his property was subject to an unlawful search and seizure, Griffin's presence would have had no effect. Neither Griffin nor her counsel would have been allowed to argue in favor of Rider's motion, see *id*., and Griffin has not cited any caselaw to the contrary. Consequently, Griffin has failed to show any plain error or prejudice with respect to her absence from that November 21, 2018 hearing.

Similarly, Griffin has not shown how her (or her counsel's) presence possibly could have had any effect at (1) the February 25, 2019 hearing in which the trial court heard arguments related to several of Gibson's motions, and (2) the September 24, 2018 hearing before the predecessor judge, Judge Jennifer M. Faunce, who heard motions brought by Rider.

At the September 24, 2018 hearing before predecessor Judge Faunce, the only defendant present was Rider and his attorney. That hearing addressed a recusal motion brought only by Rider. Rider's attorney argued that Judge Faunce should recuse herself because her sister was the judge who authorized one of the search warrants in the case, which was the subject of another motion to suppress before the trial court. Judge Faunce stated that when she denied Rider's earlier motion to suppress, she did not realize that her sister was the judge who signed the warrant. Regardless, Judge Faunce thought there could be an appearance of impropriety, so she vacated her prior decision, but only recused herself related to any matters involving the prior search warrants signed by her sister. Rider then appealed that decision to the chief judge, who ruled that a

-14-

bifurcated recusal is not permissible, fully recused Judge Faunce, and reassigned the matter to Judge Joseph Toia.

Griffin's presence would not have had any effect on any of these proceedings. These cited instances were all hearings on motions brought by codefendants, and Griffin has not demonstrated that she or her attorney would have been allowed to participate if they had been present. Griffin has cited no law applying "the right to be present" to these types of situations. Nothing prevented Griffin from filing her own motions, which would have given her an opportunity to be heard by the trial court. Indeed, although Griffin seems to complain that she was not present when codefendant Gibson argued for a severance of trials, the record shows that she filed her own motion for severance and had an opportunity to be heard in front of the trial judge. Because Griffin has failed to establish any plain error or outcome-determinative prejudice, her claim of a violation of the right to be present necessarily fails.

## C. ADMISSIBILITY OF EVIDENCE—TRACKING DOG

Griffin argues that the dog-tracking evidence was inadmissible. Because Griffin did not object to the introduction of this evidence at trial, the issue is unpreserved. "Unpreserved claims of evidentiary error are reviewed for plain error affecting the defendant's substantial rights." *Benton*, 294 Mich App at 202.

Tracking dog evidence is admissible if the evidence establishes these requirements:

> (1) the handler was qualified to use the dog; (2) the dog was trained and accurate in tracking humans; (3) the dog was placed on the trail where circumstances indicate the alleged guilty party to have been; and, (4) the trail had not become so stale or contaminated as to be beyond the dog's competency to follow it. [*People v Harper*, 43 Mich App 500, 508; 204 NW2d 263 (1972).]

On appeal, Griffin asserts that the fourth requirement was not satisfied. At trial, Troy K-9 Police Officer Adam Sinutko testified that he, along with his dog Kilo, responded to assist the Warren Police Department after the shooting. Griffin relies on the following testimony of Officer Sinutko to demonstrate that the conditions were contaminated:

> It was, was cold. It was definitely a cold 20's, maybe. There was a moderate wind. And, all these things factor in to the dog's tracking abilities. There was [sic] several officers in the area. Obviously, it was an active crime scene. There was [sic] other people in the area. I saw some people walking dogs; I saw people going to and from work. So, all of that factors in to our tracking abilities.

While Officer Sinutko stated that he saw several officers and other people "in the area," that testimony does not establish that Officer Sinutko saw all these individuals where he was *specifically* trying to track. Indeed, although there were many officers within the "active crime scene," Officer Sinutko described that he started his tracking east of the crime scene because that is where a witness supposedly saw someone running after the shooting. Notably, there was no testimony that any contamination of the surrounding area impeded Kilo's competency to detect and follow a trail. Accordingly, the presence of people "in the area" did not make the dog-tracking evidence inadmissible.

Griffin also relies on Officer Sinutko's testimony that "the Warren officer that was with me on the track did speak to somebody that was walking in this area, right back in here." This testimony, describing the person being located "right back in here" while referring to a map, is insufficient to show that the person was in the tracking area, let alone that the person's presence impeded the dog's ability to track. Notably, there is no requirement to have *zero* contamination—only that the trail not be "so" contaminated, such that the dog could not follow it. *Id*.

Griffin also relies on the fact that at one point, Kilo lost his scent. As Officer Sinutko described:

> When we lose scent on a track, and we try to reestablish the scent, because turns and stuff, and weather can affect the dog's tracking abilities. So, if we lost a scent, we try to reestablish it. So, in this case, I took Kilo -- we call it casting. We give him some lead. We, we have him circle the area to see if he can reestablish the track. Sometimes, they re-pick it up, and we continue on, and sometimes they don't. In this case, he did not re-establish the track any further.

Officer Sinutko explained that he and Kilo then performed an "area search," which is when they search through yards for human odor to see if anybody may be hiding in the area, but that search was not fruitful. Officer Sinutko then had Kilo perform an "article search," which is a look for a physical piece of evidence that may have been left behind. The initial attempt was unsuccessful, but then Officer Sinutko was asked to search the brush area on the east side of Heritage Parkway, and that is when Kilo located the pair of gloves.

Kilo was unable to make a continuous track from the crime scene to where the gloves were found. Although he tried to follow a track from near the crime scene, he was unable to do so. Thus, there is no "tracking" evidence per se that was admitted. Instead, the only substantive evidence is that Kilo found gloves that he thought had recent human scent on them. Officer Sinutko clearly explained that he only found the gloves after being asked by the Warren Police to specifically search the marshy area on the east side of Heritage Parkway. There is nothing to suggest that *this* search was compromised on account of any contamination. Therefore, Griffin's claim of error is without merit.

Moreover, even if Griffin's argument is credited, the only evidence that would be inadmissible would be that Kilo detected a human scent or odor on the gloves. The gloves themselves would still be admissible. Also, the fact that the gloves had human odor was fairly inconsequential because subsequent DNA testing showed that Gibson's DNA—not Griffin's—most certainly was on them. Again, irrespective of the admissibility of any dog-tracking or alerting evidence, the gloves and DNA evidence were admissible. Therefore, Griffin cannot demonstrate any prejudice.

## D. PROSECUTORIAL MISCONDUCT

Griffin argues that she is entitled to a new trial because of the prosecutor's comments during opening statement and closing argument. We disagree.

To preserve a claim of prosecutorial misconduct, a defendant must contemporaneously object to the alleged misconduct. *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627

(2010). Griffin did not object to most of the comments that she now challenges on appeal. This issue is preserved only with respect to the portion of the prosecutor's closing argument in which he mentioned that Johnson cannot go home to her family anymore.

Preserved claims of prosecutorial misconduct are reviewed de novo to determine if the defendant was denied a fair and impartial trial. *Thomas*, 260 Mich App at 453. Unpreserved issues are reviewed for plain error affecting substantial rights. *Watson*, 245 Mich App at 586. In the context of prosecutorial misconduct, reversal is only warranted when the prejudicial effect of an erroneous statement could not have been cured with a timely instruction. *Id*.; see also *People v Ackerman*, 257 Mich App 434, 449; 669 NW2d 818 (2003).

Griffin's complaint on appeal has two aspects. The first is that the prosecutor improperly inflamed the passions of the jury during opening statement on multiple occasions. Griffin first cites where the prosecutor said:

> The evidence will establish, it's all because of her, and because of her jealousy with her ex, a gentleman by the name of James Terrell Lattner, who was living at that condo, and had a new woman in his life, who she hated, who Ms. Griffin despised, and would not let that woman play the role of wife for Mr. Lattner.

There is nothing impermissible with these comments. The prosecutor simply was providing an overview of what he thought the evidence would show, namely, that Griffin's jealousy and hatred constituted the motive to have Johnson killed. This was proper because "[o]pening statement is the appropriate time to state the facts that will be proved at trial." *People v Ericksen*, 288 Mich App 192, 200; 793 NW2d 120 (2010). Although the prosecutor's language hardly is shocking or attention-getting, it is well-established that a prosecutor need not confine his comments to the "blandest of all possible terms." *People v Aldrich*, 246 Mich App 101, 112; 631 NW2d 67 (2001); see also *People v Ullah*, 216 Mich App 669, 678; 550 NW2d 568 (1996). Consequently, Griffin has failed to show that the challenged comment constitutes plain error.

Griffin also relies on instances of the prosecutor quoting some of the text messages Griffin sent to Lattner, all of which were extremely hostile, vulgar, and derogatory toward Johnson. Similarly, the prosecutor quoted some of Griffin's statements to Lattner, which again were hostile, vulgar, and derogatory toward Johnson, that had been captured on a video that was made at Lattner's business. Griffin claims that the prosecutor acted improperly by finding and reading to the jury "the most emotionally charged messages it could and injected them into the Court proceeding." Griffin's argument is without merit. The prosecutor simply read what he thought were portions of exhibits that would be admitted into evidence at trial. The purpose of opening statement is to inform the jury about "the facts that will be proved at trial." *Ericksen*, 288 Mich App at 200. Reading directly from proposed exhibits, which the prosecutor reasonably believed would be admitted into evidence, cannot be deemed impermissible. Indeed, these various text messages and video ultimately were admitted into evidence. Thus, Griffin has failed to establish any unfair prejudicial effect from the comments.

Griffin also contends that the prosecutor unfairly attempted to appeal to the sympathy of the jury. In support, Griffin cites the prosecutor's following comments during opening statement:

I have to stand up here and stay [sic] to you that the evidence in this case is going to be like T.V., because we're going to cover a lot of ground, we're going to cover a lot of issues. And, it's going to be my responsibility to always keep you focused on what's at issue here, Mr. Andrew's [sic] daughter, Mr. Chatman's sister, and their loss, and a killing that just didn't need to happen. Because, that's what's really at issue. Not that Mr. Lattner's refusing to testify, not that Mr. Lattner has his own legal problems.

* * *

Again, Ladies and Gentlemen, keep your eye on the ball. The ball in this case, Ladies and Gentlemen, is not the one that's being bounced and distracting with an act. It's Julii Johnson being killed out of jealousy. It's Mr. Andrews and Mr. Chatman losing their loved one. And, Ms. Johnson -- Jocelyn Johnson, as well, who can't be here with us today, the mother of the deceased.

And during closing argument, the prosecutor stated:

And, remember, the reason we are here is slide 39, please. No, it's a happy picture. If you guys need to look at the not so happy picture, it's in evidence. But, the reason we are here, because that young lady can not go home to her family anymore, to her aunt, to her family, to her brother, to her mother, to her father.

"[I]t is improper for a prosecutor to appeal to the jury's sympathy for the victim." *People v Meissner*, 294 Mich App 438, 456; 812 NW2d 37 (2011). Regarding the comments alluding to sympathy during opening statement, Griffin is not entitled to any relief. Arguably the prosecutor may have crossed the line between proper commentary and improper commentary. It seems his purpose was to inform the jury that there would be other, tertiary issues raised at trial, primarily related to Lattner, and that the jurors should not become distracted from the focus, which is the killing of Johnson. However, the prosecutor referred to "Mr. Andrew's [sic] daughter, Mr. Chatman's sister, and their loss, and a killing that just didn't need to happen." The portion referring to Andrews's and Chatman's "loss" could be viewed as an appeal to the jury's sympathy. While Johnson's death was at issue in the case, Andrews's and Chatman's "loss" was not pertinent for deciding whether any of the defendants were guilty of first-degree murder. To the extent that these remarks qualify as plain error, they were not of the severe nature that a curative instruction could not have alleviated any prejudice. Indeed, even without an objection, the trial court specifically instructed the jury that it was not to let sympathy influence its decision, and juries are presumed to follow their instructions. *Graves*, 458 Mich at 486. The trial court's instruction was sufficient to protect Griffin's substantial rights.

Griffin preserved the issue related to the prosecutor's statement during closing argument, apparently appealing to the sympathy of the jury. Again, the prosecutor stated, "the reason we are here [is] that young lady can not go home to her family anymore, to her aunt, to her family, to her brother, to her mother, to her father." This remark did not deny Griffin a fair trial. While this comment seems to cross the line of appealing to the sympathy of the jury, the trial court implicitly sustained the objection and later instructed the jury that sympathy is not to be a consideration in its deliberations. Because juries are presumed to follow their instructions, *id*., Griffin was not

-18-

denied a fair trial. Defendants are guaranteed a fair trial, not a perfect one. *People v Miller*, 482 Mich 540, 559; 759 NW2d 850 (2008).

## E. IMPARTIAL JURY

Griffin next argues that she is entitled to a new trial because the trial court failed to question the remaining jurors after it dismissed one juror in the middle of trial because the juror recognized a potential witness. We disagree. Because Griffin never requested that the trial court question the remaining jurors or otherwise argued that her right to an impartial jury was violated, this issue is unpreserved. We review unpreserved constitutional issues for plain error affecting substantial rights. *Shafier*, 483 Mich at 211.

On the eighth day of trial, Juror 1 informed the trial court that she recognized one of the potential witnesses. During questioning by the court, Juror 1, a hair dresser, stated that she recognized the witness as one of her clients. Juror 1 noted that she had an appointment to do the witness's hair the upcoming weekend. Juror 1 explained that she did not know how the witness was related to any of the parties. The prosecutor requested that Juror 1 be excused.

After further questioning, Juror 1 noted that she explained her relationship with the witness to one other juror, Juror 3. Juror 1 stated, "I just told [Juror 3] I knew -- I probably knew her that was in the stand." Juror 1 initially stated that knowing the witness would not affect her ability to render a fair and impartial decision, but when one of the officers noted in Juror 1's presence that the witness, although not related to any party, knew Griffin, Juror 1 said that Griffin's relationship with the witness likely would affect her ability to be fair and impartial. The court agreed that Juror 1 had to be excused.

After excusing Juror 1, the court also questioned Juror 3, who explained the conversation with Juror 1 as follows:

> Well, [Juror 1] said I think this young lady is in the audience that's supposed to do her hair. So, I'm like, really? So, I, I described someone new that I saw, and she said yeah, I think that's her. So, we pulled up the Instagram and I'm like yeah, that's the girl that's out there. And, that's pretty much the, the most we talked about.

Juror 3 denied that there were any other conversations with Juror 1. But Juror 3 admitted to asking Juror 1 how she felt about knowing someone in the audience, and Juror 1 responded that she was not sure because she did not know if the witness was "with" any of the defendants or the victim. Juror 3 noted that they did not discuss this with any other jurors and they were "kind of whispering," so Juror 3 did not know if anyone overheard them. After Juror 3 stated that none of this would affect the juror's ability to remain fair and impartial, Juror 3 was sent back to the jury room. No one requested any further questioning of any other jurors.

"[D]efendants have a constitutional right to an impartial jury." *Miller*, 482 Mich at 550. "The burden is on the defendant to establish that the juror was not impartial or at least that the juror's impartiality is in reasonable doubt." *Id*.

On appeal, Griffin asserts that the trial court had an obligation to sua sponte question the other jurors and its failure to do so requires reversal. Griffin relies on *People v Kamischke*, 3 Mich App 236; 142 NW2d 21 (1966), but that case is easily distinguishable. In that case, the defendant, Otto Kamischke, was convicted of uttering and publishing a forged instrument. *Id*. at 238. Kamischke was arrested with another man, Edward Maliszewski, who also was charged with uttering and publishing a forged instrument. Maliszewski's trial occurred the day before Kamischke's trial, and six members of Kamischke's jury had sat on that other trial, finding Maliszewski guilty. *Id*. Kamischke was "brought into" that other trial through name and reference. *Id*. Notably, both the trial judge and the prosecuting attorney knew that some of the jurors had served on the other trial. *Id*. This Court held that Kamischke was denied the right to a trial by an impartial jury. *Id*. at 242. The Court relied on *People v Troy*, 96 Mich 530; 56 NW2d 102 (1893), which declined to follow the doctrine that permits "jurors who have sat in one case" to "sit[] in a case against another joint respondent," when those two cases involve the same set of facts. *Id*. at 537. Instead, the Court in *Troy* held that when "the issue is the same in both cases, it is but fair to the respondent that he have another panel of jurors to try his cause." *Id*.

Unlike in *Kamischke* and *Troy*, there is no issue of a juror sitting on a different, but related, case. Although the Court in *Kamischke* stated that "[a]ll trial courts are under some obligations to guard and enforce the personal rights secured by our state and federal constitutions" and stated that "[t]he ineptitude of those charged with the responsibility of providing one accused of crime to a public trial by an impartial jury should not be charged to the accused," these pronouncements were made in the context of that case, in which both the prosecutor and trial court were fully aware that some jurors in the Kamischke case had sat on the previous Maliszewski case. *Kamischke*, 3 Mich App at 238. At most, this directive simply means that when a trial court *knows* that jurors have been compromised, it has a duty to disqualify those jurors—the court is not to leave it to a party to raise the issue. This principle of law is not implicated in the present case because there are no facts indicating that the trial court was aware that any jurors, other than Juror 1, were compromised. When the trial court learned of Juror 1's inability to render a fair and impartial verdict, it promptly dismissed her. There was no evidence that any other juror had served as a juror on a related case, and, more appropriate for this case, there was no evidence that any other juror possessed any bias on account of overhearing anything from the conversation between Juror 1 and Juror 3. First, there was no evidence that their conversation actually was overheard. Juror 3 stated that they whispered during their conversation. Second, even if the conversation was overheard, the content was not the type to create any impartiality in any other juror. Juror 3 relayed that the discussion was limited to Juror 1 indicating that she recognized a person as a business client. There was no indication of any expression of fear from Juror 1, which arguably could have had some influence on others. Accordingly, Griffin has failed to establish a plain error.

In sum, the record does not support Griffin's claim that she was denied her right to an impartial jury or that the trial court had a duty to further question the remaining jurors when it had no information that any other juror had actually been compromised. Moreover, the evidence indicates that if any other jurors overheard the conversation, it was not of the nature to create any bias.

## F. VACATION OF PRIOR ORDER

-20-

Griffin's argument for this next issue is not very well developed. Griffin appears to argue that Judge Faunce's rulings, which had been vacated with respect to defendant Rider, also should have been vacated with respect to her. We disagree. Because Griffin never made such a motion or otherwise raised this issue in the trial court, it is unpreserved. *Swenor*, 336 Mich App at 562. Therefore, we review this issue for plain error affecting substantial rights. *People v Chelmicki*, 305 Mich App 58, 62; 850 NW2d 612 (2014).

Preliminarily, Griffin's representations of the facts related to this issue are not accurate. She claims that the predecessor judge, Judge Faunce, recused herself and vacated *all* of her prior rulings with respect to defendant Rider at a September 24, 2018 hearing. As previously explained, however, at the September 24, 2018 hearing before Judge Faunce, Rider argued that Judge Faunce should recuse herself because her sister was the judge who authorized one of the search warrants in the case, which was the subject of another motion to suppress before the trial court. Judge Faunce stated that she did not realize at the time she denied Rider's motion to suppress that her sister was the judge who signed the warrant. Regardless, Judge Faunce thought that there could be an appearance of impropriety, so she vacated her prior decision, but only recused herself related to *any matters involving the prior search warrants signed by her sister*. Rider then appealed to the chief judge, who ruled that a bifurcated recusal is not permissible, fully disqualified Judge Faunce, and reassigned the case to Judge Toia.

Therefore, Griffin's assertion that Judge Faunce fully recused herself and vacated all of her prior rulings is belied by the record. Judge Faunce attempted to partially recuse herself only with respect to issues related to any warrants signed by her sister, and she only vacated her one ruling denying Rider's motion to suppress the seizure of his phones. Because this is the only ruling that Judge Faunce vacated, it is the only ruling that is implicated in Griffin's argument on appeal.

But as explained previously, Griffin has no standing to contest the seizure of Rider's phones. See *Mahdi*, 317 Mich App at 458-459 ("The right to be free from unreasonable searches and seizures is personal, and the right cannot be invoked by a third party."). This principle of law undermines Griffin's position on appeal. In other words, even assuming Rider's phones were illegally seized with respect to Rider, Griffin has no standing to challenge the seizure of Rider's phones in the case against her. Consequently, Griffin cannot establish plain error.

There also is another flaw in Griffin's argument. She seems to claim that because Judge Faunce vacated her denial of Rider's motion to suppress the seizure of his phones, that ruling should be extended to her. Looking past the standing issue, if that ruling is applied to Griffin, it does not change anything because the vacation of Judge Faunce's denial simply means that *there is no ruling addressing the legality of the seizure of Rider's phones*. Griffin's position seems to be that the vacation means something different, such as establishing that the phones were illegally seized. But after this vacation and disqualification, there was no ruling addressing the seizure, and any defendant was free to raise the issue again with the successor judge, Judge Toia. Consequently, Griffin has failed to show any plain error.

G. INEFFECTIVE ASSISTANCE OF COUNSEL

Related to Griffin's prior issues, she argues on appeal that she was denied the right to the effective assistance of counsel by counsel's failure to be present at the other proceedings involving the codefendants' motions. We disagree.

As noted earlier, to establish ineffective assistance of counsel, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and (2) there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different. *Trakhtenberg*, 493 Mich at 51.

Consistent with her prior arguments, Griffin argues that her counsel was ineffective for failing to be present at the hearings in which the trial court addressed motions raised by other codefendants. For the reasons explained earlier, Griffin's claim has no merit. First, it was reasonable for counsel to not attend these motion hearings because they involved issues raised by other codefendants. With no standing to either argue for or against any such motions, counsel's failure to attend those hearings did not fall below an objective standard of reasonableness.[12] Second, Griffin cannot establish any prejudice because there is no basis for concluding that the presence of Griffin (or her attorney) would have had any effect on any of these proceedings or any proceedings at trial. For these reasons, Griffin cannot satisfy the requisite showing of a reasonable probability that had counsel attended these hearings, the end result would have been any different. Therefore, her claim of ineffective assistance fails.

## H. ADMISSIBILITY OF EVIDENCE—CAR WASH VIDEO

Griffin argues that the video showing a confrontation between her and Lattner at his car-wash business was inadmissible. We disagree. We review this preserved evidentiary issue for an abuse of discretion. *Mahone*, 294 Mich App at 212.

Griffin initially argues that the video was inadmissible because it was not authenticated. This argument is without merit. MRE 901 governs the authentication of evidence and provides, in pertinent part:

> (a) **General Provision**. The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

Curiously, Griffin relies on testimony at the preliminary examination, where Officer Roy stated that he did not know who made the video recording. But Griffin ignores that the person who recorded the video testified both at the evidentiary hearing on the video's admissibility and at trial. Lattner's nephew, Londell Harvey, stated that he was present at the car wash during this encounter, personally recorded the video on his phone, and later sent a copy of the video to Lattner. Harvey was able to identify both Lattner and Griffin in the video. This was sufficient to show that the

---

[12] Moreover, there is no evidence that Griffin's counsel was even aware of these hearings.

video is what its proponent claimed—an altercation between Griffin and Lattner at the car wash—to satisfy the requirements of MRE 901.[13]

Griffin's claim that the video was not relevant also is without merit. "Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. Griffin asserts that her "disparaging" remarks about Johnson did not have any tendency to establish her involvement in the charged offense. "Although motive is not an essential element of the crime, evidence of motive in a prosecution for murder is always relevant." *People v Unger*, 278 Mich App 210, 223; 749 NW2d 272 (2008). Griffin made numerous references to Johnson, including calling her "nothing-ass b*tch," "b*tch," "dummy," someone who "can't fill out a resume," "stupid," and has "f**ked everybody in the city." Overall, the tenor of her conversation with Lattner was similar to her text messages: they both showed a high degree of animosity toward Johnson, and toward Lattner because he was seeing Johnson. Evidence of this hostility and animosity was probative of Griffin's motive and intent to harm Johnson, which are relevant. *Id*. Also, notably, Griffin makes the following comment in the video, "Y'all remember this conversation. B*tch, I'm coming. I promise you on my daddy, I'm getting you. I'm gonna, I'm gonna hit you in your stomach. F**k this b*tch." A reasonable juror could view that statement in particular as a promise or a threat that Griffin was going to do something to make Lattner hurt. Consequently, the trial court did not abuse its discretion when it deemed the video relevant.

Griffin also argues that the video was inadmissible under MRE 404(b)(1), which provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of *motive*, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case. [Emphasis added.]

MRE 404(b)(1) "represents the deeply rooted and unwavering principle that other-acts evidence is inadmissible for propensity purposes." *People v Denson*, 500 Mich 385, 397; 902 NW2d 306 (2017). The list of permissible purposes in MRE 404(b)(1) is not exhaustive. *People v Sabin (After Remand)*, 463 Mich 43, 56; 614 NW2d 888 (2000). Indeed, a proper purpose simply is one other than establishing a defendant's character to show his propensity to commit the charged offense. *People v Johnigan*, 265 Mich App 463, 465; 696 NW2d 724 (2005).

Griffin claims that the video was offered to show her "argumentative character," a character trait that makes it more likely she committed the charged crime. But that is not why the video was offered. The purpose of the video was not to show that Griffin has a poor character or is a bad person, and therefore, she must have planned the murder. Instead, the purpose of the video

---

[13] MRE 901(b) provides some examples of proper authentication, and one of the examples is "[t]estimony that a matter is what it is claimed to be." MRE 901(b)(1).

was to show the depth of Griffin's hatred and disdain for Johnson, and a lesser extent Lattner, which was probative of her *motive*, a proper purpose under MRE 404(b)(1). Therefore, Griffin's reliance on MRE 404(b)(1) is misplaced.

Lastly, Griffin argues that the video should have been excluded under MRE 403, which provides that evidence, "[a]lthough relevant, . . . may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." "Evidence is unfairly prejudicial when there exists a danger that marginally probative evidence will be given undue or preemptive weight by the jury." *People v Ortiz*, 249 Mich App 297, 306; 642 NW2d 417 (2001) (quotation marks and citation omitted). Griffin's argument related to MRE 403 is similar to her MRE 401 argument—she claims that the evidence was not relevant at all, and therefore its nonexistent probative value was necessarily outweighed by its prejudicial effect. However, as already discussed, the evidence was relevant to the issue of motive. See *Unger*, 210 Mich App at 223. Moreover, the probative value of the evidence was not substantially outweighed by the risk of unfair prejudice. Notably, all evidence is prejudicial. *People v Mills*, 450 Mich 61, 75; 537 NW2d 909 (1995), mod 450 Mich 1212 (1995). But MRE 403 only addresses "unfair prejudice." *Id*. The predominant prejudicial effect of the video is not "unfair." The purpose of the evidence was to show Griffin's feelings about Johnson, using Griffin's own words, for the purpose of showing that she had a motive to commit the charged crime, and that is what the evidence accomplishes. To the extent that some portions of the video are not directly probative of motive (e.g., Griffin's general profanity usage not directed toward anyone), and therefore introduced the risk of unfair prejudice, the trial court did not abuse its discretion by ruling that any such prejudice did not substantially outweigh the evidence's probative value.

Accordingly, the trial court did not abuse its discretion when it admitted the car wash video into evidence.

## IV. DOCKET NO. 350516 (DEFENDANT GIBSON)

### A. PROSECUTORIAL MISCONDUCT

Gibson argues that he was denied a fair trial because of many instances of prosecutorial misconduct. We disagree.

To preserve a claim of prosecutorial misconduct, a defendant must contemporaneously object to the alleged misconduct. *Bennett*, 290 Mich App at 475. Gibson failed to object to many of the prosecutor's comments that he challenges on appeal.[14] The only challenged comments that were preserved with an appropriate objection are the prosecutor's statements (1) that Griffin's counsel was "adding to this record that is not supported by the evidence" and (2) that it was "a

---

[14] We note that the day after closing arguments, Gibson did concur with Griffin's motion for a mistrial on account of the prosecutor's conduct. But that motion was not a contemporaneous objection and was insufficient to preserve Gibson's claims of misconduct. See *Bennett*, 290 Mich App at 475.

reasonable conclusion" to view Griffin's statement in the car wash video as being "I'm going to hit you where it hurts. I'm going to kill someone you love."

Preserved issues of prosecutorial misconduct are reviewed de novo to determine if the defendant was denied a fair and impartial trial. *Thomas*, 260 Mich App at 453. Unpreserved claims of misconduct are reviewed for plain error affecting substantial rights. *Watson*, 245 Mich App at 586. In the context of prosecutorial misconduct, reversal is warranted only when the prejudicial effect of any erroneous statement could not have been cured with a timely instruction. *Id*.; see also *Ackerman*, 257 Mich App at 449.

Gibson first avers that the prosecutor improperly attacked Griffin's counsel by repeatedly stating that he was misrepresenting the facts and misleading the jury. These challenged comments were made while objecting to Griffin's counsel's opening statement in the following exchange:

> *[Griffin's Counsel]*: This gentleman here, again, he's going to testify about cell phones. And, you're going to have a lot of questions, because not all the cell phones were dumped. Not all the cell phones were shown to have who called who, when, what. You all are going to have to guess on all that, and you promised me, when you took you oath --

> *[The Prosecutor]*: Judge, I'm going to object again. He's saying all the cell phones weren't dumped. Inaccurate, and misleading to the jury, as if the officers left something that they could've searched for. Everything was searched. Some recovered data, some didn't.

> *[Griffin's Counsel]*: I don't know what the objection is.

> *[The Prosecutor]*: But, the search was made --

> *[Griffin's Counsel]*: I don't know what the objection is.

> *[The Prosecutor]*: -- and the representation is --

> *[Griffin's Counsel]*: It's not a fair objection. If he wants --

> *[The Prosecutor]*: -- is misleading.

> *[Griffin's Counsel]*: Well, that's the objection. And, it's not misleading. The evidence will be presented, they can see it. If Judge, I'm inaccurate, hold me to it.

> *[The Prosecutor]*: The quote was, some were dumped, some weren't.

> *[Griffin's Counsel]*: That's correct, Judge.

> *[The Prosecutor]*: The quote was, some were Misleading the jurors to believe, that the officers did not complete their investigation, or do their due diligence --

> *[Griffin's Counsel]*:  Well, that's true.
>
> *[The Prosecutor]*:  -- in searching all the phones.
>
> *[Griffin's Counsel]*:  That's true, Judge.  I'm saying that's true.  That's what the evidence is going to show.
>
> *[The Prosecutor]*:  That they intentionally did not dump certain phones by choice?
>
> *[Griffin's Counsel]*:  I didn't say intentionally -- did I just say that?  I said the phones weren't dumped.  Now, if he wants to give another opening statement, he can, Judge, if that's the rule.
>
> *[The Prosecutor]*:  Judge --
>
> *[Griffin's Counsel]*:  But, that's not the rule.
>
> *[The Prosecutor]*:  He's had discovery for two years.  And, now he wants to --
>
> *[Griffin's Counsel]*:  No.  Judge, I'm just now getting some of the discovery.
>
> *[The Prosecutor]*:  -- intentionally mislead the jurors.
>
> *THE COURT*:  All right, Gentlemen.  The jury's been instructed.  Opening statements are not evidence.  Rely on the evidence that this Court admits into evidence, the documents, the exhibits, photographs, and the testimony is the evidence.

It would have been preferable if the trial court had not let this back-and-forth go on as long as it did.  The prosecutor's objection, which does not appear to have any merit, seemingly should have been dealt with right away.  In any event, although the prosecutor used terms such as "misleading," the essence of the objection was that defense counsel was not stating facts that would be proved at trial.  This is a legal objection because the purpose of opening statement is "to state the facts that will be proved at trial."  *Ericksen*, 288 Mich App at 200.  The objection, however, had no merit because it was understood and recognized that not every phone found by the police had its data dumped.  Nearly all of the phones found inside Lattner's home did not have their data dumped, and one of Gibson's flip-style phones did not have its data dumped.  Regardless, Gibson has not shown that the prosecutor's comments, made within the context of an objection directed at Griffin's counsel, deprived Gibson of a fair trial.  Moreover, the trial court responded by cautioning the jury that attorneys' arguments are not evidence, which was sufficient to alleviate any perceived prejudice.  Juries are presumed to follow their instructions.  *Graves*, 458 Mich at 486.  Accordingly, Gibson is not entitled to any relief for this alleged instance of prosecutorial misconduct.

Gibson also relies on the following exchange, which also involved an objection raised by the prosecutor during Griffin's counsel's cross-examination of Officer Sinutko:

*Q.* So, do you know -- well, you testified, and talked about earlier, that you knew that they found a gun; is that right?

*A.* Yes.

*Q.* And, do you know how far away the gun was from the gloves?

*A.* No, I don't know.

\* \* \*

*Q.* [T]hat's where the gloves were found, right? [Asked while referencing a photograph.]

*A.* Yes.

*Q.* Right next to where the gun was found, right?

*A.* I have no idea.

*Q.* If you know.

*[The Prosecutor]*: Objection, your Honor, that's the -- he already testified. Counsel's doing it intentionally to be misleading.

*[Griffin's Attorney]*: No, I --

*THE COURT*: Sustain the objection. He's test --

*[The Prosecutor]*: Thank you, your Honor.

*[Griffin's Attorney]*: (Inaudible).

*THE COURT*: Hold on, counsel.

*[Griffin's Attorney]*: What's the objection?

*THE COURT*: [H]e's testified that he had nothing to do with the gun.

*[Griffin's Attorney]*: I understand. But, I can still ask him about the gun.

*THE COURT*: You've asked him.

*[The Prosecutor]*: And, the improper question, your Honor, was, and the gun was right next to the gloves; isn't that true? He's already laid the foundation, he has nothing to do with the, with the gun. It's intentionally misleading.

*THE COURT*: The foundation objection is sustained.

[Griffin's Counsel]: Well, I don't even understand intentionally misleading. That's not a legal objection.

[The Prosecutor]: Lying.

[Griffin's Counsel]: That's not, that's not.

THE COURT: The objection is foundation, and it's sustained.

We agree that the prosecutor should not have suggested that Griffin's counsel was "lying" or being "misleading." Although the prosecutor's objection was sustained by the trial court, the same objection could have been successfully raised without the extraneous commentary. Nevertheless, the comments were not of such a nature to deprive Gibson of a fair trial. The comments did not pertain to Gibson or his counsel, and any perceived prejudice was cured by the court repeatedly instructing the jury that attorneys' arguments are not evidence.

Gibson also relies on 13 different instances during the prosecutor's closing and rebuttal arguments. Two of the instances involved the prosecutor purportedly appealing to the sympathy of the jury. The first occurred during closing argument, where the prosecutor stated:

Don't buy into the smoke in [sic] mirrors. Don't buy into the argument that muddies the waters. There's no evidence, whatsoever, that the gun [found in Lattner's pickup] has anything to do with the death of Julii Johnson, because the only thing that we are concerned here, is we are concerned here for getting justice for Julii's family, Mr. Andrews, her father, Ms. Jocelyn Johnson, her mother, Mr. Je'mere Chatman, her brother, and her whole family. And, this is a murder case. Terrell Lattner's not on trial regarding money, and guns, and drugs.

The second involves the following remarks made during the prosecutor's rebuttal argument:

And, remember, the reason we are here is slide 39, please. No, it's a happy picture. If you guys need to look at the not so happy picture, it's in evidence. But, the reason we are here, because that young lady can not go home to her family anymore, to her aunt, to her family, to her brother, to her mother, to her father.

"It is improper for a prosecutor to appeal to the jury's sympathy for the victim." *Meissner*, 294 Mich App at 456. These comments were made in the context of the prosecutor trying to keep the jurors focused on what he considered pertinent. The prosecutor did not want the jury to become bogged down with the issues surrounding Lattner, including his apparent drug business and firearm, because all of that was irrelevant to Johnson's shooting death under the prosecution's theory of the case. Such an argument is permissible. However, the prosecutor arguably may have crossed the line prohibiting appeals for sympathy by referring to Johnson's family. But to the extent that these comments qualify as plain error, they were not so prejudicial that a curative instruction would not have alleviated any prejudice. Moreover, even without an objection, the trial court instructed the jury that it was not to let sympathy influence its decision, and juries are presumed to follow their instructions. *Graves*, 458 Mich at 486. The court's instruction was sufficient to protect Gibson's substantial rights. Consequently, Gibson cannot prevail on this claim of prosecutorial misconduct.

Gibson next argues that the prosecutor deprived him of a fair trial by referring to Griffin's counsel's questions regarding the dog tracking when making the following remarks:

> This sets the scene for you [referring to Exhibit 10], Ladies and Gentlemen, at how all the other pieces of evidence come in. Original scene, the dog track. Remember Officer Sinutko testified where he started his dog track, over here off to the side?
>
> Not when [Griffin's counsel] was showing his video tape and had a different officer walking down the sidewalk saying he, didn't Officer Sinutko testify that that's where he started his dog track? Do you remember that? Do you remember that red herring? Do you remember that misleading question?

It is improper for a prosecutor to suggest that defense counsel was trying to distract the jury from the truth. *Unger*, 278 Mich App at 238. Thus, characterizing defense counsel's question as "misleading" seems to run astray from that principle. But see *Watson*, 245 Mich App at 592-593 (holding that the prosecutor's argument that defense counsel was attempting to distract the jurors and to get them to not pay attention to the truth was permissible because it was in response to defense argument). In any event, because a timely objection and curative instruction could have alleviated any prejudicial effect from the statement, Gibson is not entitled to any relief. Moreover, the jury was instructed that it was to only consider the admitted evidence in its deliberations and that the attorneys' arguments (and questions) are not evidence.

Gibson next argues that the prosecutor engaged in misconduct when a purportedly objectionable screenshot related to Griffin was displayed. Apparently, this occurred during the prosecutor's closing argument:

> The next, People's Proposed 50 -- I'm going to jump and not show the sensitive picture of the bullet wound in open court, Ladies and Gentlemen. I have family; I have friends. If you want to see that picture that was taken at the autopsy, regarding the wound I've already described, you will be given this binder, and you can review any picture you want. But, I'm going to jump to People's 52. Next one. That one.
>
> Picture of Marcie Griffin --
>
> THE COURT:[15] Judge, can we approach, briefly?
>
> THE COURT: Take it down, please.
>
> (At about 2:17 p.m. Bench Conference Held).

---

[15] Because this statement is addressing the trial judge, it is apparent that the transcript incorrectly attributes it to the trial court.

*[The Prosecutor]*:  If that's okay, your Honor.  May I continue?

*THE COURT*:  Please continue.

It is not from the record (1) what the screenshot precisely consisted of[16] and (2) exactly how long it was displayed.[17]  However, Gibson concedes that the slide pertained solely to Griffin.  As such, to the extent that the slide injected some prejudicial effect, it was directed solely at Griffin, and it would not necessarily impact Gibson.  The prosecution's theory, which was supported by the evidence, was that Gibson was the shooter and had no direct contact with Griffin.  Thus, any taint or prejudice introduced with respect to Griffin would not affect Gibson.  Accordingly, Gibson has not shown that he was denied a fair trial.

Gibson next relies on the following comments by the prosecutor during his rebuttal argument:

> I finally agree with [Griffin's attorney] on one thing that he said.  This is a house of cards.  But, it was his closing argument that was a house of cards, because it was based on inaccuracy and the manipulation of the evidence.  And, then, at times, an intentional misrepresentation of the evidence, and taking things out of context.

* * *

> [Griffin's attorney] argued in his closing statement that he's got a lot to own, and there are things to own in this case.

Griffin's attorney objected to both comments.  In response to the first instance, the trial court simply instructed the prosecutor to "[m]ove on" and to "stick to the evidence and the facts of this case."  In the second instance, the objection was that the comment was inaccurate and shifted the burden of proof.  The trial court sustained the objection and instructed the jury to disregard the comment.

The prosecutor's "house of cards" comment was made in response to the following arguments by Griffin's attorney during his closing argument:

> This case is about smoke and mirrors in a house of cards.  This case is about a lemon meringue pie that doesn't have the lemon and the filling.

> Because, I hate somebody, doesn't mean I'm going to kill you.  I don't have hate in my heart.  But, just because someone fights with their ex or with the father

---

[16] Apparently, the slide may have shown a picture of Griffin with the words, "Wicked Marcie" somewhere on the slide, but Gibson has failed to provide a copy of this document to this Court, despite this Court's request.

[17] It also is unclear if it was that particular slide that prompted the prosecutor to say, "Next one," or if it was the one he intended to display by saying, "That one."

of their children, because he doesn't take care of them -- one thing Winston [a witness who had known both Lattner and Griffin for many years] might've been correct about was (inaudible), you know, the girlfriend at the time.

This is a house of cards. On the outside it may look like a brick. It may present itself as a brick. When you look to the side, it's as thin as paper. Give me one piece of evidence that you can hang your hat on, that connects my client to Mr. Gibson. That she aided and abetted Mr. Gibson.

If they're claiming he's the defendant in the shooting, how did he -- how did my client give him aid? Give me one piece of evidence that says my client gave instructions to solicit a murder, to buy a murder, solicitation. Give me one. Can you point to it, please? You can't.

A prosecutor's arguments are to be viewed in light of the arguments presented by defense counsel. *Dobek*, 274 Mich App at 64. Thus, with Griffin's attorney calling the case against his client a "house of cards," it was permissible for the prosecutor to employ the same verbiage. However, it is questionable whether the prosecutor should have suggested that Griffin's counsel was "lying" or being "misleading." *Unger*, 278 Mich App at 238; but see *Watson*, 245 Mich App at 592-593 (holding that the prosecutor's argument that defense counsel was attempting to distract the jurors and to get them to not pay attention to the truth was permissible because it was in response to defense argument). Nevertheless, the comments were not of such a nature to deprive Gibson of a fair trial. As before, the comments did not pertain to Gibson or his counsel, and any prejudice was cured by the court repeatedly instructing the jury that attorneys' arguments are not evidence.

The comment about Griffin's attorney having "a lot to own" was also made in direct response to his argument, where he stated:

I've had to own a lot of things. I've had to own a lot of things. Don't find my client guilty; find her not guilty.[18]

At the outset, it is unclear what Griffin's counsel's meant or was trying to convey by the comment about having had "to own a lot of things," whether in this case or in his lifetime. The prosecutor's comments about Griffin's counsel having a lot to own in this case simply was responsive to counsel's argument—indeed, agreeing with it. Although the meaning of defense counsel's argument is not clear, the prosecutor attempted to respond to this comment using the same verbiage. We therefore find no error. See *Dobek*, 274 Mich App at 592-593. It is not evident how the prosecutor's comment of defense counsel having a lot to own substantially differed from counsel's own admission that he "had to own a lot," and in any event, the court sustained the objection and specifically instructed the jury to disregard the comment. Moreover, with this

---

[18] When Griffin's counsel objected to the prosecutor's "a lot to own" comment, he claimed that his prior statement was "I have owned a lot in my lifetime, not that I have a lot to own." Griffin's counsel's characterization of his remark is not supported by the transcript.

commentary pertaining to Griffin's attorney, it is further evident that it did not deny Gibson a fair trial.

Next, Gibson argues that the prosecutor again improperly referred to Griffin's attorney when he stated the following:

> Let's go to some other styles, style of questioning. How about do you remember when Livingston was on the stand? Livingston was the bald officer with the thick, bushy mustache who talked about going to a lot of the other condos looking for security videos, going to the other businesses, and so forth. And, did you see the style throughout the whole trial, ask witness A about what B did? And, then when B's on the stand, ask him about what A did? Remember my objections?

Griffin's attorney objected, not because of the comments regarding his style of questioning, but rather because the prosecutor was relying on his own objections, which Griffin's counsel noted were overruled. In response, the trial court noted that the jury would be instructed that objections are not to be part of its considerations. There is no plain error. Further, a curative instruction was provided, which was sufficient to alleviate any perceived prejudice.

Gibson next maintains that the following comment by the prosecutor deprived him of a fair trial:

> Remember the testimony when Livingston was on the stand, and he was getting questions about what Ruston did? And, then there was that one question of Detective Livingston, would you be surprised if there was a video that exists of the way Rushton seized the phones and what he was doing? But, we'll get back to that later. Do you remember that? That's the style of the question.

> And, that's why we have a jury instruction, Ladies and Gentlemen, the lawyer's statements and arguments are not evidence. Because, what he [Griffin's attorney] is doing is he is adding to this record that is not supported by the evidence.

The trial court sustained objections raised by all three defendants.

It is apparent that the prosecutor was attempting to provide examples of things the jury should not consider because they are not evidence, including attorneys' suggestive questions and comments. Some of the questions and commentary during Griffin's attorney's cross-examination of Sgt. Livingston that the prosecutor was referencing include:

> *Q.* Do you remember him [Rushton] threatening Ms. Bellamy about taking her kids if you don't, you don't cooperate with me?

> *A.* I don't remember that.

> * * *

> *Q.* Do you threaten people to cooperate?

-32-

*A.* Do we threaten them?  No.

*Q.* Would you be surprised if that was done in this case?

*A.* Yes.

*Q.* If I played you an audio, would it help you refresh your recollection?

*A.* Sure.

*[Griffin's Attorney]*:  Okay.  I will do that, Judge, outside the presence of the jury, at another time, and bring him back for that.

Notably, there is nothing in the record to show that any audio was ever played for Sgt. Livingston, and he was not recalled to testify.  The prosecutor merely was attempting to convey that simply asking a question is not evidence, and that Griffin's attorney's suggestion in front of the jury that audio exists showing that a witness was threatened is not evidence.  We perceive no error.  Gibson's suggestion that this type of prosecutorial commentary shifts the burden of proof to the defense is without merit.  The prosecutor's comment did not suggest that the defense had to do or prove anything.  It merely attempted to highlight for the jury that questions or comments, let alone suggestive or potentially inflammatory ones, are not evidence.

Gibson also takes issue with another allegation of misrepresentation, when the prosecutor argued in rebuttal:

There was an argument made regarding the text messages that were [sic—we're] taking them out of context.  Okay?  And, it was just simple banter, an argument between people that share children in common, and that's it.

And, maybe that me, we, the People, the shoddy police investigation, the shoddy presentation to you, even though a thorough prosecutor was referenced to you, the shoddy presentation to you, *they totally misrepresented the text messages*.  [Emphasis added.]

Although Gibson (and Griffin's counsel, who objected at trial) appeared to believe that the prosecutor was referring to the defense when he said "they totally misrepresented the text message," we cannot agree.  From the context, it appears that the prosecutor was reiterating Griffin's counsel's position that the text messages were innocuous and that they, i.e., *the government actors*, were misrepresenting what the messages meant.  The principal indicator that the "they" refers to government actors is the prosecutor's preface of "maybe that me, we . . . ."  Although the text is disjointed no matter how it is viewed, because the prosecutor started with "maybe that me, we," it makes more sense that the later "they totally misrepresented the text messages" still refers to "me, we."  In other words, it appears that the prosecutor was inviting the jury to accept the premise of what defense counsel said—that the prosecution was misrepresenting the meaning of the text messages between Griffin and Lattner.  In support of this view, the prosecutor continued:

How do you misunderstand this is the ultimate, the b*tch running around telling mf she was your girlfriend. Told my best friend you her man. You let that b*tch disrespect me the ultimate no no. That's December 5th. December 5th, a month before the murder.

\* \* \*

[I]s that car wash video taken out of context? You saw that anger. You heard the statements. I'm going to hit you where it hurts.

The prosecutor's continuing comment was made in the context of the *prosecution's* so-called misrepresentation of the text messages, i.e., "How do you misunderstand this[?]" and "[I]s that car wash video taken out of context?" Stated another way, the prosecutor's argument can be summarized as "defense counsel suggests that we have been misrepresenting the communications between Griffin and Lattner, but when you look at the actual communications, you can see that they are incapable of being misrepresented." Although defense counsel seemingly misconstrued what the prosecutor was referring to when he mentioned "they," the record indicates that the prosecutor was referring to the government, and there is nothing unfairly prejudicial with this type of argument. And again, to the extent that there was any perceived prejudice, the trial court's instruction that the attorneys' comments are not evidence was sufficient to protect Gibson's substantial rights.

Relatedly, Gibson also takes exception to the prosecutor continuing, "You heard the statements. I'm going to hit you where it hurts. *I'm going to kill someone you love, is what a reasonable conclusion --*" (Emphasis added.) The prosecutor's comment was cut off by the following exchange:

> *[Griffin's Attorney]*: Oh, Judge -- (inaudible) --
>
> *[The Prosecutor]*: -- of the evidence supports.
>
> *[Rider's Attorney]*: Okay. That's it. I mean, objection.
>
> *[Griffin's Attorney]*: Such a mischaracterization --
>
> *THE COURT*: Is there an objection, so I can --
>
> *[Gibson's Attorney]*: Objection, on behalf of Mr. Gibson.
>
> *[Griffin's Attorney]*: Yes. It's a mischaracterization --
>
> *THE COURT*: -- so I can make a ruling?
>
> *[Griffin's Attorney]*: -- of the evidence and inflammatory to the jury. That's exactly what that was.
>
> *THE COURT*: I'm going to sustain that objection. You are to disregard that comment.

It is undisputed that Griffin never stated, "I'm going to kill someone you love." However, the prosecutor was not suggesting that Griffin actually said those words. Instead, the prosecutor was in the process of arguing that it was a "reasonable conclusion" that this is what Griffin meant by the words she used. Defense counsel interjected just as the prosecutor was explaining this point and it is possible that others did not hear the "reasonable conclusion" portion of the prosecutor's comment. Regardless, the transcript is clear on what the prosecutor said, and a prosecutor is allowed to argue reasonable inferences from the evidence. *Watson*, 245 Mich App at 588. A reasonable person could view Griffin's statement as a promise or a threat that she was going to do something to cause Lattner pain, of which killing or harming his girlfriend would qualify.

Similarly, Gibson argues that the prosecutor improperly mentioned that Rider was at the crime scene the night before Johnson was killed. But as explained earlier, this argument was proper commentary on the evidence that, the night before the offense, Rider's phone was utilizing a cell-phone tower whose coverage area encompassed the site of the crime. It was permissible to infer from this evidence that Rider was indeed present at the crime scene the night before Johnson was killed.

In sum, none of the prosecutor's comments deprived Gibson of a fair trial. In most of the instances, there was no error. In the remaining instances, any perceived prejudice was cured by the trial court's instructions to the jury, which the jury is presumed to have followed, *Graves*, 458 Mich at 486, or did not affect Gibson because the challenged comments were directed toward codefendant Griffin or her attorney. Accordingly, Gibson's claim of prosecutorial misconduct fails.

## B. ISSUES RAISED IN GIBSON'S STANDARD 4 BRIEF

In a supplemental pro se brief, filed pursuant to Supreme Court Administrative Order No. 2004-6, Gibson challenges the validity of two search warrants and also argues that trial counsel was ineffective for failing to have those warrants quashed. We disagree. Because Gibson did not raise his ineffective-assistance claims in a motion for a new trial or request for an evidentiary hearing, this Court's review of whether counsel was ineffective "is limited to mistakes apparent on the record." *People v Riley (After Remand)*, 468 Mich 135, 139; 659 NW2d 611 (2003). A magistrate's determination of probable cause is not reviewed de novo; instead, it is to be paid great deference by reviewing courts. *People v Keller*, 479 Mich 467, 474; 739 NW2d 505 (2007); *People v Whitfield*, 461 Mich 441, 446; 607 NW2d 61 (2000).

Although Gibson's allegations of ineffective assistance are not easy to decipher, the gist of the allegations are focused on defense counsel's attempts (or lack thereof) to challenge search warrants related to the procurement of Gibson's DNA and data from the cell-phone company. Gibson has failed to overcome the strong presumption that counsel was effective. See *LeBlanc*, 465 Mich at 578.

The record discloses that defense counsel filed an emergency motion in limine to quash the search warrant for obtaining Gibson's DNA and the warrant seeking recovery of data from Gibson's cell phone. Regarding the DNA warrant, defense counsel argued that the supporting affidavit contained a false statement that was knowingly and intentionally made, specifically that Gibson's appearance matched the appearance of the suspect seen in the video from L.A. Fitness.

Defense counsel requested a hearing. At the hearing, however, Gibson personally requested that the motion be withdrawn. He claimed that "it's evident that [defense counsel] is conspiring with the prosecutor and trying to get me convicted." Defense counsel explained that "this is the same motion" that Gibson had been "requesting at every single hearing since the beginning." Counsel wanted to proceed with the motion, but Gibson adamantly wanted the motion withdrawn. The trial court cautioned that if the motion was withdrawn, it would not consider it at a later date, and Gibson maintained that he wanted it withdrawn. The trial court took a brief recess to allow Gibson to discuss the matter with his attorney. Afterward, defense counsel stated that he was withdrawing the motion, and Gibson agreed with that outcome.

Later, Gibson's counsel filed a different emergency motion to quash the search warrant related to the cell-tower data. At the hearing on that motion, after counsel argued the motion's merits, Gibson again personally demanded that the motion be withdrawn.

Gibson first avers that trial counsel was ineffective for failing to investigate the sufficiency of the affidavit in support of the warrant to collect Gibson's DNA. The record does not support this claim. Counsel had attempted to challenge the sufficiency of the affidavit, but Gibson wanted the motion withdrawn. Moreover, assuming counsel should have somehow investigated more, Gibson has not demonstrated a reasonable probability that the outcome would have been any different. The argument that Gibson maintains his counsel should have raised in the trial court was indeed raised by Gibson. At a hearing on April 24, 2019, Gibson argued, in part, that the affidavit supporting the warrant for obtaining his DNA lacked probable cause. The trial court ruled that the affidavit in support of the warrant was sufficient to establish probable cause. Thus, the issue was raised before and decided by the trial court.

In any event, Gibson's position that the affidavit did not establish probable cause is without merit. The affiant, Det. Livingston, averred, in pertinent part, that Griffin, who was the primary suspect, had communicated "numerous" times with Rider and that 12 minutes after the shooting, Rider's phone was located at a location that was about a 12-minute drive from the crime scene. Det. Livingston further averred that Rider's SUV matched the appearance of the vehicle that was seen in the L.A. Fitness surveillance video near the crime scene. And linking Gibson to the crime, Det. Livingston stated that mail found inside the SUV had Gibson's name, that Rider had Gibson listed as a contact in his phone, and that Rider made three outgoing calls to Gibson's phone "just prior to the homicide." Finally, Det. Livingston stated that Gibson's height and weight as listed in Secretary of State records matched the eyewitness description of the suspect leaving the homicide scene and matched the appearance of the suspect seen in the L.A. Fitness video. Gibson provides nothing but conclusory statements in support of his position that there was no probable cause. An appellant may not merely announce a position and leave it to this Court to rationalize the position. *People v Harris*, 261 Mich App 44, 50; 680 NW2d 17 (2004). Regardless, it is clear that the allegations in the affidavit provided probable cause to conclude that Gibson was involved with the crime and that his DNA could be evidence. Notably, "[t]o provide adequate support for a warrant, the affidavit need not *prove* anything." *Whitfield*, 461 Mich at 445. " 'The traditional standard for review of an issuing magistrate's probable-cause determination has been that so long as the magistrate had a "substantial basis for concluding" that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more.' " *Id*. at 446, quoting *Gates*, 462 US at 238 (brackets and ellipsis omitted). The affidavit alleged that Rider, who had had contact with the primary suspect, called Gibson multiple times just before the shooting, and that Rider's phone was

in a location such that it could have been present near the crime scene when it happened that morning. The affidavit also showed that Gibson's appearance was at least consistent with that of the suspect described by a witness and displayed on surveillance video. Without proving that Gibson was indeed involved, there nonetheless was a "substantial basis" for concluding that he was. Simply put, there was nothing to overcome the "great deference" reviewing courts are to afford a magistrate's probable-cause determination. See *Keller*, 279 Mich at 474, 476-477. Accordingly, the magistrate did not err by signing the warrant, and counsel was not ineffective for failing to raise this issue or supplement Gibson's oral argument. See *Ericksen*, 288 Mich App at 201 (stating that failing to raise a meritless argument does not constitute ineffective assistance of counsel).

Gibson also challenges trial counsel's failure to challenge the sufficiency of the search warrant related to the cell-phone data stored by the cell-phone company. In particular, Gibson asserts that facts in ¶ 27 of the supporting affidavit were intentionally made while knowing they were false. This Court has stated:

> *Franks v Delaware*, 438 US 154, 155-156; 98 S Ct 2674; 57 L Ed 2d 667 (1978), requires that if false statements are made in an affidavit in support of a search warrant, evidence obtained pursuant to the warrant must be suppressed if the false information was necessary to a finding of probable cause. In order to prevail on a motion to suppress the evidence obtained pursuant to a search warrant procured with alleged false information, the defendant must show by a preponderance of the evidence that the affiant had knowingly and intentionally, or with reckless disregard for the truth, inserted false material into the affidavit and that the false material was necessary to a finding of probable cause. *Id*. at 171-172; *People v Williams*, 134 Mich App 639, 643; 351 NW2d 878 (1984). [*People v Stumpf*, 196 Mich App 218, 224; 492 NW2d 795 (1992).]

The portion of ¶ 27 that Gibson highlights is as follows:

> This phone [Rider's phone] was in contact with phone numbers known to be associated with [Marcie] Griffin beginning 01/07/2017.

> This phone was also in contact with Metro PCS phone number . . . 2531 identified in the phone contact list as "Eric Gibson" on the day of the shooting; 01/13/2017. George Rider makes three outgoing phone calls to "Eric Gibson" at 0524 HRS, 0544 HRS and 0548 HRS.

Gibson has not shown that any of these statements were false. Gibson's primary argument is that the three calls placed from Rider's phone to his phone never went through, which means that there was no "contact." We reject this hypertechnical argument. Initially, the affidavit does not state that the calls were answered or that Rider and Gibson personally spoke during the three calls. Instead, the affidavit states that there was "contact" between Rider's phone and Gibson's phone in the form of "three outgoing calls." Just because there may have been no answer on the recipient's end, i.e., no contact between the people, does not mean that there were no outgoing calls or that Rider's phone did not have contact with Gibson's phone. Accordingly, even if the calls were never answered, that does not make the statement false, and Gibson's reliance on this so-called false

-37-

statement is misplaced. Consequently, trial counsel was not ineffective for failing to advocate a meritless position. See *Ericksen*, 288 Mich App at 201.

Gibson also asserts that it was a false statement that the 2531 phone was "associated" with him and that counsel was ineffective by failing to raise this challenge. But Rider's list of contacts in his phone had Gibson's name cross-referenced with the 2531 number, and more conclusively, the 2531 phone ultimately was retrieved from Gibson's person.[19] Therefore, that number was "associated" with Gibson, see *Merriam-Webster's Collegiate Dictionary* (11th ed) (defining "associated," in pertinent part, as being "related" or "connected"), and his claim of error with respect to the warrant and affidavit has no merit. Likewise, counsel was not ineffective for failing to raise or argue this particular argument. See *Ericksen*, 288 Mich App at 201.

Gibson finally argues that trial counsel was ineffective because he was unprepared for closing argument. The record does not support this claim. Gibson's counsel provided a cogent and thoughtful closing argument. He raised the poignant questions to the jury of how would Gibson even know that Johnson would be present at Lattner's home that morning when Johnson owned a home in Hazel Park, and how would Gibson know that she would be leaving Lattner's house at that precise time. Counsel brought Lattner's situation to the jury's attention, suggesting that drug dealing is a "tricky," i.e., dangerous, business. Counsel also stressed to the jury the "messed up" testing in the Michigan State Police lab related to DNA.[20] Simply put, there is nothing in the record to show that counsel was not prepared for closing argument. The fact that the argument did not persuade the jury does not mean that counsel was ineffective. Counsel had an uphill battle because DNA linked to Gibson with an *extreme* high degree of certainty was found on both the murder weapon and the gloves that were found near the crime scene. Gibson's argument seems to primarily rely on the fact that at one point before closing argument, trial counsel showed him his handwritten notes regarding the argument, asking if he had any changes to suggest, but Gibson claimed he could not read the "scribbling" handwriting. Even if counsel had poor penmanship or his handwritten notes were otherwise illegible, that does not constitute ineffective assistance. In short, counsel made a reasonable and competent argument that did not fall below an objective standard of reasonableness under prevailing professional norms.

In sum, Gibson's issues raised in his Standard 4 brief have no merit. Gibson has not identified any viable means to challenge either of the search warrants, and the record does not show that counsel was not prepared or otherwise ineffective during closing argument.

## V. CONCLUSION

---

[19] Although Gibson's possession of the phone was not known to the affiant at the time he executed the affidavit, it is still relevant for disproving the falsity Gibson claims exists.

[20] Although not pertinent to the issues on appeal, there was evidence that DNA samples from the Smith & Wesson firearm and the Lugar firearm were mislabeled or switched at the lab. However, one of the biologists testing the DNA noticed incongruous results that did not make sense, which led to the samples being retested. The retests confirmed the biologist's view that there had been a mix-up. The jury was aware of all the issues surrounding this issue.

We affirm Griffin's conviction in Docket No. 350168, and affirm Gibson's convictions in Docket No. 350516. In Docket No. 350096, we affirm in part and remand for further proceedings consistent with this opinion to determine whether Rider is entitled to a new trial on the basis of ineffective assistance of counsel. We retain jurisdiction with respect to the issue on remand only.

/s/ David H. Sawyer
/s/ Douglas B. Shapiro
/s/ James Robert Redford

# Court of Appeals, State of Michigan

## ORDER

David H. Sawyer
Presiding Judge

People v George Gerald Rider

Douglas B. Shapiro

Docket No.    350096

LC No.        2017-003420-FC

James Robert Redford
Judges

Pursuant to the opinion issued concurrently with this order, this case is REMANDED for further proceedings consistent with the opinion of this Court.  We retain jurisdiction.

Proceedings on remand in this matter shall commence within 56 days of the Clerk's certification of this order, and they shall be given priority on remand until they are concluded. As stated in the accompanying opinion, the trial court shall determine whether defendant is entitled to a new trial on the basis of ineffective assistance of counsel. The proceedings on remand are limited to this issue.

The parties shall promptly file with this Court a copy of all papers filed on remand.  Within seven days after entry, appellant shall file with this Court copies of all orders entered on remand.

The transcript of all proceedings on remand shall be prepared and filed within 21 days after completion of the proceedings.

/s/ David H. Sawyer
Presiding Judge

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

August 18, 2022
Date

Chief Clerk